UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| U.S. BANK TRUST NATIONAL ASSOCIATION, AS TRUSTEE OF THE BUNGALOW SERIES IV TRUST<br>　　　　Plaintiff,<br><br>v.<br><br>JOHN JOSEPH TRAVERS<br>　　　　Defendant(s) | Civil Action No. |

## VERIFIED COMPLAINT

### Jurisdiction and Venue

1.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) since there is complete diversity between Plaintiff and all Defendants and the amount in controversy exceeds $75,000.00.

2.     Venue is proper under 28 U.S.C. § 1391(b)(2) since the real property that is subject to this complaint is located in the State of Rhode Island.

3.     Plaintiff seeks to foreclose a mortgage to Plaintiff pursuant to R.I.G.L. § 34-27-1, et seq.

## Parties

4.      Plaintiff U.S. Bank Trust National Association, as Trustee of the Bungalow Series IV Trust has a usual place of business at 7114 E Stetson Drive, Scottsdale, AZ 85251 (the "**Plaintiff**").

5.      John Joseph Travers (the "**Defendant**") is an individual who, upon information and belief, resides at 51 Riverview Avenue, Tiverton, RI (the "**Property**").

6.      The Property is further described by the Town of Tiverton Tax Assessors as Lot 129, Plat 302."

## Facts

7.      John M. Travers and Dorothy V. travers executed and delivered a Quitclaim deed for the Property to Defendant John Joseph Travers as sole tenant, which deed was recorded on March 20, 2007, in Land Evidence Records for the Town of Tiverton at Book 1130 at Page 277.  *See* **Exhibit A**.

8.      There is an unbroken chain of title of not less than 40 years, which creates marketable record title in Defendant pursuant to R.I.G.L. § 34-13.1-2. See **Exhibit B**.

9.      John M. Travers (deceased) and Defendant John Joseph Travers executed and delivered a note dated June 15, 2007, to Primary residential Mortgage Inc. in the original principal amount of $300,000.00 (the "**Note**"). See **Exhibit C**.

10.      The note was endorsed in blank.

11.      John M. Travers (deceased) became deceased on January 19, 2015.  A true and accurate copy of the Death Certificate is attached hereto as **Exhibit D**.

12.      The Plaintiff is the current holder of the Note.

13.     SN Servicing Corporation is the servicer of the loan.

14.     As security for the Note, Defendant John Joseph Travers executed, granted, and delivered a mortgage in the amount of $300,000.00 to Mortgage Electronic Registration Systems, Inc (MERS) as nominee for Primary Residential Mortgage Inc. dated June 15, 2007, and recorded in the Land Evidence Records for the Town of Tiverton (the "**Mortgage**").  See **Exhibit E**.

15.     Said mortgage was modified by virtue of a loan modification dated November 30, 2016, and recorded January 12, 2017, in the Land Evidence Records for the Town of Tiverton, attached hereto as **Exhibit F**.

16.     The Mortgage was assigned from Mortgage Electronic Registration Systems, Inc. (MERS) as nominee for Primary Residential Mortgage Inc. to CitiMortgage, Inc.

17.     The Mortgage was then assigned by CitiMortgage, Inc. to Federal National Mortgage Association.

18.     The Mortgage was then assigned by Federal National Mortgage Association to U.S. Bank Trust National Association as trustee for the Igloo Series IV Trust.

19.     The Mortgage was then finally assigned by U.S. Bank Trust National Association as trustee for the Igloo Series IV Trust to U.S. Bank Trust National Association, as Trustee of the Bungalow Series IV Trust, the Plaintiff in the instant matter.

20.     Copies of the assignments of mortgage are attached hereto as **Exhibit G**. The Mortgage is secured by the Property located in the Town of Tiverton, more particularly described as follows:

A certain tract or parcel of land with the buildings and improvements thereon, if any, situated on the southwesterly side of Riverview Avenue in the Town of Tiverton, County of Newport, State of Rhode Island, being further bounded and described as follows:

Beginning at a point in the southwesterly line of Riverview Avenue at a drill hole, which is the northerly corner of the lot to be described; thence running Southwesterly by a stonewall, 193 feet to a corner; thence running Southeasterly by other land now or formerly of these grantors and partly by Lot 21 on plan of land hereinafter described, 150 feet, more or less, to land of Elton H. Sanford; thence running Northeasterly by said last-named land, 130 feet to Riverview Avenue; thence running Northwesterly by Riverview Avenue, 127 feet to the point of beginning.

Containing 16,064 square feet of land, more or less.

Being designated as Lot 9 recorded in Plan Book 2, Page 27 of the Tiverton Land Evidence Records.

Also being designated as Lot 9 on plan of land entitled, "LAND OF JOHN M. TRAVERS RIVERVIEW & MT.HOPE AVENUE TIVERTON, R.I.I. 1"=40'  APR. 12, 1988 J. P. AMARANTES, RLS." Recorded in Plan Book 18, Page 14.

For source of title see Deed of John M. Travers and Dorothy V Travers dated March 20, 2007 and recorded in the Land Evidence Records of Tiverton in Book 1130, Page 277.

21.    The Plaintiff is the present holder of the Note and Mortgage.

22.    No person other than the parties hereto appears of record in Land Evidence Records for the Town of Tiverton to have any interest in the Property.

## COUNT I

23.    Plaintiff realleges and reaffirms the allegations set forth in paragraphs 1-22 as if restated herein.

24.    Defendant is in default in the performance of the terms and conditions of the Note by reason of failure to timely tender principal and interest payments as required by the terms of the Note.

25.    As of March 2, 2023, the sum of $27,760.97 was necessary to cure the default.

26.    As a result of the default, Plaintiff is entitled to foreclose the sums due and owing in connection with the Note.

27.     As of March 22, 2023, the sum of $341,478.43 was due and owing to Plaintiff from Defendant in connection with the Note.

28.     Defendant has no defenses or right of set off with respect to the amounts due in connection with the Note, with the exception of any deficiency balance due and owning in connection with the Note which may have been discharged in bankruptcy.

29.     On or about January 31, 2023, Plaintiff, via its authorized servicer of the Mortgage, sent a notice of default and demand in accordance with the notice and default provisions of the Mortgage.

30.     On or about March 22, 2023, Plaintiff or its predecessor in interest, or authorized servicer of the Mortgage, or anyone holding under the Mortgage, by its attorneys, sent a notice of acceleration of the debt pursuant to the notice and default provisions of the Mortgage.

<u>COUNT II</u>

31.     Plaintiff realleges and reaffirms the allegations set forth in paragraphs 1-30 as if restated herein.

32.     Defendant John Joseph Travers, as the present owner of the Property, is the owner of the equity of redemption of the Property.

33.     Defendant is in default in the performance of the terms and conditions of the Mortgage, namely, default in the payment of principal and interest of the Note secured by the Mortgage.

34.     Plaintiff is entitled to foreclose the Mortgage, in full or partial satisfaction of the Defendants' obligations in connection with the Note and Mortgage pursuant to their terms and applicable law.

35.     Plaintiff is entitled to foreclose the Mortgage by entry and possession and by exercise of the power of sale contained therein, in accordance with R.I.G.L. § 34-27-1, et seq.

36.     Upon information and belief and upon examination of the public records, there are no other parties with an equitable interest in the Property.

37.     Upon information and belief and upon examination of the public records, there are no other parties with a mortgage, lien, or encumbrance with respect to the Property.

38.     Upon information and belief, there are no persons having any interest of ownership who are in the Military Service of the United States of America or otherwise entitled to the relief and benefits provided by the Act of Congress known as the Soldiers' and Sailors' Civil Relief Act of 1940, as amended.  See **Exhibit H.**

WHEREFORE, Plaintiff prays that the following relief enter:

1.  That an order of notice issue on this Complaint, if the Court deems appropriate;

2.  Declare that the Mortgage recorded in the Land Evidence Records for the Town of Tiverton, Rhode Island is a valid lien on the Property;

3.  Declare that Defendant, John Joseph Travers, is in default of the terms and conditions of the Note and Mortgage;

4. Enter an interlocutory decree authorizing the Plaintiff to foreclose the Mortgage recorded in the Land Evidence Records for the Town of Tiverton on June 18, 2007, in book 1147 at page 103;

5. Enter judgment in favor of Plaintiff for the sums due and owing from Defendants in connection with the Note and Mortgage with the exception of any deficiency balance due and owning in connection with the Note which may have been discharged in bankruptcy;

6. Enter an Order authorizing Plaintiff to satisfy its Judgment from the foreclosure pursuant to the terms of the Mortgage;

7. The Court approve the acts of the Plaintiff done and performed under the authority of any interlocutory decree authorizing a foreclosure sale and enter a final decree confirming the foreclosure sale; and

8. Such other and further relief as this Honorable Court deems meet and just.

Respectfully submitted,

U.S. Bank Trust National Association, as Trustee of the Bungalow Series IV Trust, By its attorney,

David A. Shaw, Esq. 03497
Demerle Hoeger LLP
10 City Square
Boston, MA 02129
(617) 337-4444
(617) 337-4496 (fax)
DShaw@dhnewengland.com

DATE: May     , 2023

*Verification Page to Follow*

## VERIFICATION

I reviewed the allegations set forth in the foregoing complaint and verify and affirm

that the allegations are true based on my review of the records maintained in the

ordinary course of business and review of the public records maintained by the Town of

Tiverton.  For those allegations set forth as information and belief, I believe them to be

true based on the information I reviewed.

By:

Name:_____Jordan Kahoalii_____

Title:_____Asset Manager_____

SN Servicing Corporation

Date: May 2, 2023

EXHIBIT A

Doc #: 00000948
BK: 1130 Pg: 277

## QUITCLAIM DEED

JOHN M. TRAVERS, DOROTHY V. TRAVERS of Tiverton, County of Newport, State of Rhode Island, and JOHN JOSEPH TRAVERS of Fall River, County of Bristol, Commonwealth of Massachusetts, in consideration paid of ONE AND NO/100 ($1.00) DOLLAR, grant to JOHN JOSEPH TRAVERS of 55 Middlesex Street, Fall River, MA, 02723, with QUITCLAIM COVENANTS,

A certain tract or parcel of land with the buildings and improvements thereon, if any, situated on the southwesterly side of Riverview Avenue in the Town of Tiverton, County of Newport, State of Rhode Island, being further bounded and described as follows:

Beginning at a point in the southwesterly line of Riverview Avenue at a drill hole, which is the northerly corner of the lot to be described; thence running Southwesterly by a stonewall, 193 feet to a corner; thence running Southeasterly by other land now or formerly of these grantors and partly by Lot 21 on plan of land hereinafter described, 150 feet, more or less, to land of Elton H. Sanford; thence running Northeasterly by said last-named land, 150 feet to Riverview Avenue; thence running Northwesterly by Riverview Avenue, 127 feet to the point of beginning.

Containing 16,064 square feet of land, more or less.

Being designated as Lot 9 recorded in Plan Book 2, Page 27 of the Tiverton Land Evidence Records.

Also being designated as Lot 9 on plan of land entitled, "LAND OF JOHN M. TRAVERS RIVERVIEW & MT.HOPE AVENUE TIVERTON, R.I. 1"=40' APR. 12, 1988 J. P. AMARANTES, RLS."

Being a portion of the premises conveyed to John Joseph Travers by John M. Travers and Dorothy V. Travers dated May 15, 2006 and recorded with said Land Evidence Records in Book 1070, Page 126.

The undersigned do hereby covenant that they are residents of the State of Rhode Island in compliance with R.I.G.L. 44-30-71.3 as evidenced by affidavit.

The undersigned hereby certify that the grantors have complied with the requirements of R.I.G.L. 23-28-.35-1 and all other provisions of both the smoke detector and carbon monoxide laws.

WITNESS my hand and seal this          day of March, 2007.

_John M Travers_
John M. Travers

Block 67    Card 8

_Dorothy V Travers_
Dorothy V Travers

_John Joseph Travers_
John Joseph Travers

## COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.

On this          day of March, 2007, before me, the undersigned notary public/justice of the peace, personally appeared John M. Travers, Dorothy V. Travers and John Joseph Travers, proved to me through satisfactory evidence of identification, which was/were a driver's license, to be the person/people whose name(s) is/are signed on the preceding or attached document, and acknowledged to me that he/she/they signed it voluntarily for its stated purpose.

_Cele E. ____
Notary Public/Justice of the Peace
My commission expires: 2/28/0/4

RECEIVED
TOWN OF TIVERTON
Mar 20,2007 12:04:43P
AND RECORDED ATTEST
NANCY L. MELLO, TOWN CLERK

EXHIBIT B

RECEIVED
TOWN OF TIVERTON
May 16,2006 12:53:51P

Doc #: 00001881
Bk: 1070 Pg: 126

Property Address: 51 Riverview Avenue, Tiverton, RI 02878

# QUITCLAIM DEED

We, John M. Travers and Dorothy V. Travers, husband and wife, currently of 51 Riverview Avenue, Tiverton, Rhode Island 02878,

In full consideration of one dollar ($1.00), receipt of which is hereby acknowledged,

grant to John Joseph Travers of 55 Middlesex Street, Fall River, Massachusetts, Individually, with a LIFE ESTATE to ourselves and QUITCLAIM COVENANTS,

A certain tract or parcel of land, together with all buildings and improvements thereon, situated in Tiverton, County of Newport, State of Rhode Island, bounded and described as follows:

Beginning at a point in the northerly line of proposed Mount Hope Avenue, eighty-four and 36/100 (84.36) feet easterly from its intersection from proposed Central Avenue; from thence running northerly in line of a wall and to a point in the southerly line of Riverview Avenue, eighty-four and 16/100 feet from its intersection with proposed Central Avenue about two hundred and sixty eight (268) feet; from thence running easterly in the southerly line of proposed Riverview Avenue, one hundred twenty-seven (127) feet for a corner; from thence running southerly, bounded easterly by land formerly of S. Gilman Bowen, two hundred sixty (260) feet to proposed Mount Hope Avenue to a stake stuck in the ground; from thence running westerly bounded southerly by said Mount Hope Avenue, one hundred seventy and 7/10 feet to the point of beginning, and containing the ONE HUNDRED FORTY-THREE and 12/100 (143.12) SQUARE RODS of land, be the same more or less.

Being the same premises conveyed to these grantors by deed of Ambrosina Tavares a/k/a Ambrosina Traves dated September 5, 1973 and recorded in the Land Evidence Records of Tiverton, RI in Book 113, Page 0208.

Also being the same premises conveyed to Ambrosina Tavares a/k/a Ambrosina Traves by deed of Louise Pelissier dated June 28, 1944 and recorded in the Land Evidence Records of Tiverton, RI in Book 72, page 279.

## NO TITLE EXAMINATION

Witness our hands and seals this 15th day of May, 2006.

John M. Travers

Dorothy V. Travers

AND RECORDED ATTEST
NANCY L. MELLO, TOWN CLERK

**COMMONWEALTH OF MASSACHUSETTS**          **COUNTY OF BRISTOL**

In the Town of Swansea, on this 15th day of May, 2006, before me, the undersigned notary public, personally appeared John M. Travers and Dorothy V. Travers, who proved to me through satisfactory evidence of identification, which were a Rhode Island Driver's License and a RE Dept. of E Daily Affairs Card to be the persons whose name are signed on the preceding or attached document, and acknowledged to me that they signed it voluntarily for its stated purpose.

LAW OFFICES OF
LINDA L. CLARKE
& ASSOCIATES, P.C.
28 MARKET STREET
SWANSEA, MA 02777
(508) 379-9000

Block 67  Lt#8

Notary Public
My commission expires: 10/25/07

EXHIBIT C

# NOTE

June 15, 2007
[Date]

TIVERTON
[City]

RHODE ISLAND
[State]

MIN: 1001464-0140490212-7
MERS TELEPHONE: (888) 679-6377

51 RIVERVIEW AVE, TIVERTON, RHODE ISLAND 02878
[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $300,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is PRIMARY RESIDENTIAL MORTGAGE INC.. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.625%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the FIRST day of each month beginning on August 1, 2007. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on July 1, 2037, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 4750 WEST WILEY POST WAY #200, SALT LAKE CITY, UTAH 84116 or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $1,920.93.

### 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

### 5. LOAN CHARGES

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Page 1 of 3

Form 3200 1/01

Initials: 

NN (0107) 02
usc3200

NOTE

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**5. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Page 2 of 3

Form 3200 1/01
Initials:

Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial Interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
JOHN J TRAVERS                -Borrower

Social Security No.: 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

_____ (Seal)
JOHN M. TRAVERS              -Borrower

Social Security No.: 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

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

*[Sign Original Only]*

Pay to the order of:

Without Recourse
PRIMARY RESIDENTIAL MORTGAGE INC.

By:_____

Name and Title:

Closing Date: June 15, 2007

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3200 1/01
                                          Page 3 of 3

EXHIBIT D

# CERTIFICATION OF VITAL RECORD

## STATE OF RHODE ISLAND

**RHODE ISLAND DEPARTMENT OF HEALTH**
**CERTIFICATE OF DEATH**

PHYSICIANS MUST COMPLETE SHADED AREAS ONLY. FUNERAL HOME MUST COMPLETE UNSHADED AREAS.

LOCAL FILE NUMBER 2015-1

STATE FILE NUMBER

**DECEDENT**

| 1. NAME – FIRST: John | MIDDLE: Mello | LAST: TRAVERS | 2. SEX: Male | 3. DATE OF DEATH (Month, day, year): 01-19-2015 |

TYPE OR PRINT IN BLACK INK

4a. HOSPITAL OR OTHER INSTITUTION – NAME (if not in either, give street and number): 51 Riverview Avenue

4b. CITY, TOWN, OR LOCATION OF DEATH: Tiverton

ADDITIONAL INSTRUCTIONS ON REVERSE SIDE.

| 5a. AGE – LAST BIRTHDAY (Years): | 5b. UNDER 1 YEAR: MONTHS / DAYS | 5c. UNDER 1 DAY: HOURS / MIN. | 6. DATE OF BIRTH (Month, day, year): July 11, 1921 | 7. BIRTHPLACE (City and State or Foreign Country): Portsmouth RI |

8. EVER IN U.S. ARMED FORCES? (Specify Yes or No and War, if any): Yes WWII

9a. HISPANIC ORIGIN (Yes or No. If Yes, Specify Origin): No

9b. RACE (Use all that apply): White

10. SOCIAL SECURITY NUMBER

11. MARRIED, NEVER MARRIED, WIDOWED, DIVORCED, CIVIL UNION, DOMESTIC PARTNER (Specify): Widowed

12. SPOUSE / PARTNER (Give maiden name, if applicable): Dorothy Veronica O'Conne

13a. USUAL OCCUPATION (Give kind of work done during most of working life. Do NOT use retired): Foreman

13b. KIND OF BUSINESS OR INDUSTRY: Lumber Sales

14a. RESIDENCE ADDRESS (House number and street name): 51 Riverview Avenue

14b. CITY OR TOWN OF RESIDENCE, STATE, ZIP CODE: Tiverton RI 02878

15. MAILING ADDRESS – If different from residence address in item above (P.O. Box, RFD Number, City/Town or Village, State, Zip Code): Same

**PARENTS**

| 16. FATHER / PARENT – FIRST NAME: Antone | MIDDLE: Mello | LAST / MAIDEN NAME: Travers | 17. MOTHER / PARENT – FIRST NAME: Ambrosina da Conceicao | MIDDLE: Amaral |

16a. INFORMANT – FULL NAME: John J. Travers

16b. MAILING ADDRESS (Street or RFD Number, City or Town, State, Zip Code): 51 Riverview Ave. Tiverton RI 02878

**DISPOSITION**

18a. BURIAL, CREMATION, DONATION, OTHER (Specify): Burial

18b. PLACE OF DISPOSITION (Name of cemetery, crematory, or other place): Pocasset Hill Cemetery

CITY OR TOWN: Tiverton STATE: RI

20a. SIGNATURE OF FUNERAL HOME LICENSEE: George C. Lima

20b. FUNERAL HOME – NAME: George C. Lima Funeral Home

20c. FUNERAL HOME LICENSE NUMBER: 33

ITEMS BELOW TO BE COMPLETED BY CERTIFYING PHYSICIAN ONLY

20d. FUNERAL HOME – ADDRESS (Street or RFD Number, City or Town, State, Zip Code): 367 High St. Bristol, RI 02809

**PHYSICIAN**

21a. To the best of my knowledge, death occurred at the time, date and place given due to the cause(s) stated. (Signature): MD

DEGREE (MD or DO):

21b. R.I. LICENSE NUMBER: 04898

21c. DATE SIGNED (Month, day, yr): 1-22-15

21d. HOUR OF DEATH (Enter hours, not clock time): 2:55 pm

21e. WAS DEATH REFERRED TO MEDICAL EXAMINER? ☐ Yes ☐ No

21f. NAME & ADDRESS OF CERTIFIER (Type or Print): MD East Main Portsmouth RI 02871

31e. HOSPITAL DEATH? ☐ Yes (Check a box below) ☐ DOA [See 21f] | 31f. NON-HOSPITAL DEATH:

☐ Inpatient ☐ Emer. Room/Outpatient ☐ DOA | ☐ Hospice Facility ☐ Nursing Home ☐ Decedent's Home ☐ Other (Specify)

31l. NAME AND ADDRESS OF ATTENDING PHYSICIAN IF OTHER THAN CERTIFIER IN 21f (Type or Print)

21j. LENGTH OF ATTENDANCE (Specify days, wks, months, yrs)

**REGISTRAR**

22a. REGISTRAR (Signature): Nancy M. [?] TOWN CLERK

22b. FILE DATE – DATE RECEIVED BY REGISTRAR (Month, day, yr): 01-21-2015

23. PART I. Enter the chain of events – disease, injuries, or complications – that directly caused the death. DO NOT enter terminal events such as cardiac or respiratory arrest or ventricular fibrillation without showing the etiology.

**CAUSE OF DEATH**

IMMEDIATE CAUSE (Final disease or condition resulting in death):
a. congestive heart failure
DUE TO (OR AS A CONSEQUENCE OF): 6 months

Sequentially list conditions, if any, leading to the cause listed on line a.
b. coronary artery disease
DUE TO (OR AS A CONSEQUENCE OF): 2 years

Enter the UNDERLYING CAUSE (Disease or injury that initiated the events resulting in death) LAST
c.
DUE TO (OR AS A CONSEQUENCE OF):

d.
DUE TO (OR AS A CONSEQUENCE OF):

23. PART II. Other significant conditions contributing to death but not resulting in the underlying cause given in Part I.

24a. AUTOPSY PERFORMED? ☐ Yes ☐ No

24b. Were autopsy findings available to complete the cause of death? ☐ Yes ☐ No

25a. TOBACCO USE – DID TOBACCO USE CONTRIBUTE TO DEATH? ☐ Yes ☐ No ☐ Probably ☐ Unknown

25b. PREGNANCY – IF FEMALE, THE DECEDENT WAS:
☐ Not pregnant within past year | ☐ Pregnant at time of death | ☐ Not pregnant, but pregnant within 42 days of death | ☐ Not pregnant, but pregnant 43 days – 1 year before death | ☐ Unknown if pregnant within past year

26. ACCIDENT ☐ Yes ☐ No | 27. DATE OF INJURY (Month, day, year) | 28. HOUR OF INJURY? | 29. INJURY AT WORK? ☐ Yes ☐ No | 30. PLACE OF INJURY (e.g. decedent's home, construction site, wooded area, restaurant, etc.)

31. LOCATION OF INJURY | STREET & HOUSE NUMBER | CITY/TOWN | STATE | ZIP CODE

32. DESCRIBE HOW INJURY OCCURRED

R.I. Law requires Funeral Director to file this certificate with the City or Town Clerk at the Place of Death within 7 days.

VS-3 Rev 1/2013



SCANNED

PETTY

002 [?] 77

I hereby certify that this is a true and exact copy of the document officially registered and placed on file in the issuing office.

Issuing Office: Tiverton

Date of Issuance: 4/24/2023

Signature of Registrar: Joan B Chabot

THIS COPY VALID ONLY IF ISSUED ON WATERMARKED PAPER CONTAINING SECURITY FIBERS, DISPLAYING SEAL AND SIGNATURE OF STATE OR LOCAL REGISTRAR.

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE



EXHIBIT E

Doc #: 00002086
Bk: 1147 Pg: 103

Return To:
PRIMARY RESIDENTIAL MORTGAGE INC.
4750 WEST WILEY POST WAY #200
SALT LAKE CITY, UTAH 84116
Attn - SHIPPING DEPT /DOC. CONTROL
L
Prepared By:

[Space Above This Line For Recording Data]

## MORTGAGE

MIN:
MERS TELEPHONE: (888) 679-6377

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated June 15, 2007, together with all Riders to this document.
(B) "Borrower" is JOHN J TRAVERS   And John Joseph TRAVERS
                                                                              Borrower is the mortgagor under this
Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel (888) 679-MERS.

RHODE ISLAND - Single Family - Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT WITH MERS

Page 1 of 15

Form 3040 1/01 (rev. 11/01)

Initials: _____

Doc #: 00002086
Bk: 1147 Pg: 104

(D) "Lender" is PRIMARY RESIDENTIAL MORTGAGE INC.. Lender is a corporation organized and existing under the laws of the State of NEVADA. Lender's address is 4750 WEST WILEY POST WAY #200, SALT LAKE CITY, UTAH 84116.

(E) "Note" means the promissory note signed by Borrower and dated June 15, 2007. The Note states that Borrower owes Lender Three Hundred Thousand And 00/100 Dollars (U.S. $ 300,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than July 1, 2037.

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[ ] Adjustable Rate Rider      [ ] Condominium Rider           [ ] Second Home Rider
[ ] Balloon Rider             [ ] Planned Unit Development Rider [ ] 1-4 Family Rider
[ ] VA Rider                  [ ] Biweekly Payment Rider       [X] Other(s) [specify]
                                                               NON-REFUNDABILITY RIDER

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

RHODE ISLAND - Single Family - Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT WITH MERS

Form 3040 1/01 (rev. 11/02)

Page 2 of 13

Initials: _____

Doc #: 00002086
Bk# 1147 Pg# 105

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS, (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with Mortgage Covenants upon the Statutory Condition and with the Statutory Power of Sale, the following described property located in the

County                                    of    NEWPORT:
        [Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]

## LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number:
which currently has the address of 51 RIVERVIEW AVE                              [Street]
TIVERTON [City] , Rhode Island 02878 [Zip Code]("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands; subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and.

RHODE ISLAND - Single Family - Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT WITH MERS                                    Form 3048 1/01 (rev. 11/03)

                    Page 3 of 13

                                                          Initials: _____

Doc #: 00002086
Bk: 1147 Pg: 106

late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such

Doc #: 00002886
Bk#: 1147 Pg: 107

waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.    Charges; Liens.  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

RHODE ISLAND - Single Family - Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT WITH MERS

Page 5 of 13

Form 3040 1/01 (rev. 1/03)

Initials _____

Doc #: 00002086
Bk: 1147 Pg: 105

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

RHODE ISLAND - Single Family - Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT WITH MERS

Page 5 of 15

Form 3040 1/01 (rev. 11/03)

Initials: _____

Doc #: 00002086
Bk: 1147 Pg: 107

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have

Doc #: 00002086
Bk: 1147 Pg: 110

utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

RHODE ISLAND - Single Family - Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT WITH MERS

Form 3040 1/01 (rev. 11/02)

Page 8 of 15

Initials: _____

Doc #: 00002086
Bk: 1147 Pg: 111

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

RHODE ISLAND - Single Family - Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT WITH MERS

Page 9 of 15

Form 3040  1/01 (rev. 11/02)

Initials _____

Doc #: 00002086
BK: 1147 Pg: 112

. All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one

RHODE ISLAND - Single Family - Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT WITH MERS

Page 10 of 15

Form 3040 1/01 (rev. 11/02)

Initials:

Doc #: 00002086
Bk: 1147 Ps: 113

designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

'16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

·    If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured

RHODE ISLAND - Single Family - Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT WITH MERS

Form 3040  1/01 (rev. 1/01)

Initial: _____

Doc #: 00002086
Bk: 1147 Pg: 114

hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance

Doc #: 00002086
Bk: 1147 Pg: 115

affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower as provided in Section 15. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following orders: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, this Security Instrument shall become null and void. Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. No Outstanding Automatic Orders in Domestic Relations Cases. Borrower hereby represents and warrants to Lender that either (a) there is no outstanding automatic order under Chapter 15-5 of the Rhode Island General Laws against any Borrower relating to a complaint for dissolution of marriage, legal separation, annulment, custody or visitation or (b) there is an outstanding automatic order under Chapter 15-5 of the Rhode Island General Laws against a Borrower relating to a complaint for dissolution of marriage, legal separation, annulment, custody or visitation, and the other party that is subject to such order has consented to, or the court which issued the automatic order has issued another order authorizing, such Borrower's execution of the Note and this Security Instrument.

25. Homestead Estate. If Borrower heretofore has acquired or hereafter acquires an estate of homestead in the Property, Borrower hereby agrees that such homestead estate is waived to the extent of this Security Instrument and the amount due under the Note and to the extent of all renewals, extensions and modifications of this Security Instrument or the Note, and that said homestead estate is subject to all of the rights of Lender under this Security Instrument and the Note and all renewals, extensions and modifications of this Security Instrument and the Note, and is subordinate to the lien evidenced by this Security Instrument, and all renewals, extensions and modifications of this Security Instrument. Furthermore, Borrower hereby waives the benefits of any homestead or similar laws or regulations that may otherwise be applicable from time to time.

RHODE ISLAND - Single Family - Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT WITH MERS

Page 13 of 15

Form 3040 1/01 (rev. 11/03)

Initial:

Doc #: 00002026
Bk: 1147 Pg: 116

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _John J. Travers_____ (Seal)
                              JOHN J TRAVERS                      -Borrower

_____    _____ (Seal)
                                                                 -Borrower

_____    _____ (Seal)
                                                                 -Borrower

_____    _____ (Seal)
                                                                 -Borrower

RHODE ISLAND - Single Family - Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT WITH MERS

Page 14 of 15

Form 3840 1/01 (rev. 11/01)

Doc #: 00002086
Bk: 1147 Pg: 117

COMMONWEALTH OF MASSACHUSETTS                        County ss:    Bristol
On this __15th__ day of __June__ 2007 ___, in __Fall River___,
in said County, before me personally appeared
JOHN J TRAVERS   N/K/A  John  Joseph  Travers
each and all to me known and known to me to be the person(s) executing the foregoing instrument and
acknowledged said execution to be his/her/their free act and deed.

Notary Public    Luke P Travis

LUKE P. TRAVIS
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
My Comm. Expires Jan. 5, 2012

RHODE ISLAND - Single Family - Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT WITH MERS

Page 15 of 15

Form 3040 1/01 (rev. 11/01)

Initials: __JJT__

Doc #: 00002086
Bk: 1147 Pg: 118

## Exhibit A

A certain tract or parcel of land with the buildings and improvements thereon, if any, situated on the southwesterly side of Riverview Avenue in the Town of Tiverton, County of Newport, State of Rhode Island, being further bounded and described as follows:

Beginning at a point in the southwesterly line of Riverview Avenue at a drill hole, which is the northerly corner of the lot to be described; thence running Southwesterly by a stonewall, 193 feet to a corner; thence running Southeasterly by other land now or formerly of these grantors and partly by Lot 21 on plan of land hereinafter described, 150 feet, more or less, to land of Elton H. Sanford; thence running Northeasterly by said last-named land, 130 feet to Riverview Avenue; thence running Northwesterly by Riverview Avenue, 127 feet to the point of beginning.

Containing 16,064 square feet of land, more or less.

Being designated as Lot 9 recorded in Plan Book 2, Page 27 of the Tiverton Land Evidence Records.

Also being designated as Lot 9 on plan of land entitled, "LAND OF JOHN M. TRAVERS RIVERVIEW & MT.HOPE AVENUE TIVERTON, RI. 1"=40' APR. 12, 1988 J. P. AMARANTES, RLS." Recorded in Plan Book 18, Page 14.

For source of title see Deed of John M. Travers and Dorothy V Travers dated March 20, 2007 and recorded in the Land Evidence Records of Tiverton in Book 1130, Page 277.

EXHIBIT F

(Page 1 of 9)

Copy

DOC# 00000127
Bk# 1616 Pg: 114

When recorded mail to: #:10539890
First American Title ▐▌▐▌▐▌▐▌▐▌▐▌▐▌▐▌▐▌▐▌
Loss Mitigation Title Services 30585.1
P.O. Box 27670
Santa Ana, CA 92799
RE: TRAVERS - PR DOCS

———————————————— [Space Above This Line For Recording Data] ————————————————

Loan Number: ███
Investor Loan Number: 1███
Seterus NMLS ID Num ███

## LOAN MODIFICATION AGREEMENT

This Loan Modification Agreement ("Agreement"), made this 3rd day of November, 2016, between TRAVERS, JOHN J ("Borrower") and Seterus, Inc. ("Servicer") Loan Servicer for Federal National Mortgage Association ("Lender"), amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), and Timely Payment Rewards Rider, if any, dated June 15, 2007 and recorded in 1.7 - Book or Liber 1147, at page(s) 103, 1.8-Instrument Number 00002086, of the County Records of Newport and (2) the Note, bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at

   51 RIVERVIEW AVE, TIVERTON RI 02878-0000,

the real property described being set forth as follows:
   Property Legal Description - See Attached Exhibit A

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. As of December 01, 2016, the amount payable under the Note and the Security Instrument (the "New Principal Balance") is U.S. $340,646.86 consisting of the unpaid amount(s) loaned to Borrower by Lender plus any interest and other amounts capitalized.

TRAVERS, JOHN J   ███
LOAN MODIFICATION AGREEMENT--Single Family—Fannie Mae UNIFORM INSTRUMENT   Form 3179 1.01 (rev. 06.12)

DHB
Page 1 of 8

(Page 2 of 9)

Copy

DOC: 00000127
Bk: 1616 Pg: 115

2. $107,000.00 of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and Borrower will not pay interest or make monthly payments on this amount. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is $233,646.86. Interest at the rate of 2.000% will begin to accrue on the Interest Bearing Principal Balance as of November 01, 2016 and the first new monthly payment on the Interest Bearing Principal Balance will be due on December 01, 2016. The new Maturity Date will be November 01, 2056. My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Payment Begins On | Number of Monthly Payments |
|-------|---------------|---------------------------|-----------------------------------------------|-------------------|----------------------------|
| 1-5   | 2.000%        | 11/1/2016                 | $ 707.54                                       | 12/1/2016         | 60                         |
| 6     | 3.000%        | 11/1/2021                 | $ 822.00                                       | 12/1/2021         | 12                         |
| 7-40  | 3.500%        | 11/1/2022                 | $ 881.33                                       | 12/1/2022         | 408                        |

3. Borrower agrees to pay in full the Deferred Principal Balance and any other amounts still owed under the Note and Security Instrument by the earliest of: (i) the date Borrower sells or transfers an interest in the Property, (ii) the date Borrower pays the entire Interest Bearing Principal Balance, or (iii) the new Maturity Date.

4. If Borrower makes a partial prepayment of Principal, the Servicer may apply that partial prepayment first to any Deferred Principal Balance before applying such partial prepayment to other amounts due.

5. In addition to the regularly scheduled payments that Borrower is required to pay under the Modification Agreement, Borrower agrees to pay Servicer an escrow payment in the amount of 675.73 for deposit into an escrow account for necessary payments to be made by Servicer, including but not limited to, payments for property taxes and insurance. As permitted by the Real Estate Settlement Procedures Act and other applicable law, Servicer may adjust the amount of the Escrow Payment. After notice of such adjustment, Borrower shall pay the adjusted Escrow Payment.
   (a) Each Escrow Payment shall be due on the same day(s) of the month as the regularly scheduled payments due under the Modification, commencing December 01, 2016.
   (b) In the event Escrow Payments are not made and Servicer advances its own funds to make payments that should have been paid from Borrower's escrow account, such amounts will be added to Borrower's loan obligation under the Note.
   (c) Any failure to make an Escrow Payment when due shall be deemed to be a default under the Note and Modification Agreement and upon Borrower's failure to pay the Escrow Payment, Servicer may exercise its rights under the Note and Modification Agreement.

TRAVERS, JOHN J

Copy

DOC: 00000127
Bk: 1616 Pg: 116

    (d) Unless an agreement is made in writing or applicable law requires interest to be paid on the escrow account payments held by Servicer, Servicer shall not be required to pay any interest or earnings on the payments held.

6.  If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

    If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

7.  Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument; however, the following terms and provisions are forever canceled, null and void, as of the date specified in paragraph 1 above:
    (a) All terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note, including, where applicable, the Timely Payment Rewards rate reduction, as described in paragraph 1 of the Timely Payment Rewards Addendum to Note and paragraph A.1. of the Timely Payment Rewards Rider. By executing this Agreement, Borrower waives any Timely Payment Rewards rate reduction to which Borrower may have otherwise been entitled; and
    (b) All terms and provisions of any adjustable rate rider, or Timely Payment Rewards Rider, where applicable, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

8.  Borrower understands and agrees that:
    (a) If Borrower has failed to make any payments as a precondition to this modification under a workout plan or trial period plan, this modification will be null and void.
    (b) All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.
    (c) All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the

TRAVERS, JOHN J
LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT    Form 3179 1.01 (rev. 06.12)    DHB
Page 3 of 8

**Copy**

DOC: 00000127
Bk: 1616 Pg: 117

Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender.

(d) Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

(e) All administration and processing costs incurred by Servicer in connection with this Agreement, such as required notary fees, recordation fees, title costs, and property valuation fees, shall be paid by the Servicer, unless otherwise stipulated.

(f) Borrower will make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower.

(g) Borrower will execute other documents as may be reasonably necessary to correct an error (including but not limited to any inaccuracy, mistake, or omission), if an error is detected after execution of this Agreement. In the event an error is detected, a corrected Agreement will be provided to Borrower, and this Agreement will be void and of no legal effect, upon notice of such error. If Borrower elects not to sign any such corrected Agreement, the terms of the original Note and Security Instrument shall continue in full force and effect, and such terms will not be modified by this Agreement.

9.  Borrower will pay to Lender, on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums, in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be

Copy

DOC: 00000127
Bk: 1616 Pg: 118

a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount, and Borrower shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this paragraph.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a Lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items, or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured), or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender and Borrower can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess Funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to Borrower any Funds held by Lender.

TRAVERS, JOHN ▇▇▇▇▇▇▇▇

LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT     Form 3179  1.01 (rev. 06.12)

DHB
Page 5 of 8

**Copy**

DOC: 00000127
Bk: 1616 Pg: 119

10. Any and all attorneys fees and legal costs incurred by Borrower or its representatives, with respect to this loan, will be the sole responsibility of the Borrower.

11. In the event of future default, Borrower authorizes Lender and Lender's successors and assigns, to share certain Borrower public and non-public personal information including, but not limited to (i) name, address, telephone number, (ii) Social Security Number, (iii) credit score, (iv) income, and (v) payment history and information about Borrower's account balances and activity, with an authorized third party, which may include, but is not limited to, a counseling agency, state or local Housing Finance Agency, or similar entity that is assisting Borrower in connection with obtaining financial assistance, including the Trial Period Plan to modify Borrower's loan ("Authorized Third Party").

Borrower understands and consents to Lender or Authorized Third Party, as well as Fannie Mae (the owner of Borrower's loan), disclosing such personal information and the terms of any relief, including the terms of the Trial Period Plan to modify Borrower's loan, to any insurer, guarantor, or servicer that insures, guarantees, or services Borrower's loan or any other mortgage loan secured by the Property on which Borrower is obligated, or to any companies that perform support services to them in connection with the loan or any other mortgage loan secured by the Property on which Borrower is obligated.

Borrower consents to being contacted by Fannie Mae, Lender, or Authorized Third Party concerning mortgage assistance relating to Borrower's loan including the Trial Period Plan to modify Borrower's loan, at any telephone number, including mobile telephone number, or email address Borrower has provided to Lender or Authorized Third Party.

By checking this box, Borrower also consents to being contacted by text messaging. ☐

In Witness Whereof, the Servicer and I have executed this Agreement.

_Amberlynn Ounaphom_  A~                    DEC 0 2 2016

Seterus, Inc.  Authorized Signer                    Date

_John J. Travers_

TRAVERS, JOHN J                                   _10-30-16_
, 51 RIVERVIEW AVE                                 Date

**Copy**

DOC: 00000127
Bk: 1616 Ps: 120

_____ [Space Below This Line For Acknowledgments] _____

State of RHODE ISLAND
County of _Newport_

In _Newport_ in said County on the _30th_ day of
_November_, _2016_, before me personally appeared TRAVERS,
JOHN J, each and all to me known, and known by me to be the party(ies) executing the foregoing instrument,
and he/she/they acknowledged said instrument, by _John J. Travers_
executed to be his/her/their free act and deed.

_____
(Signature of Notary, title)

My Commission Expires: _10 22 2016_

State of Oregon

County of Washington

On _____, before me, _____, personally appeared _____
Authorized Signer of Seterus, Inc., who proved to me on the basis of satisfactory evidence to be the person(s)
whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed
the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public
State of Oregon

My commission expires on:

Commission No.

TRAVERS, JOHN J ▇▇▇▇▇
LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT    Form 3179 1.01 (rev. 06.12)    DHB
Page 7 of 8

(Page 8 of 9)

**Copy**

DOC: 00000127
Bk: 1616 Pg: 121

State of Oregon

County of Washington

On 12/2/2016, before me, **Angela M Mueller**, personally appeared **Amberlynn Ounaphom, Authorized Signer of Seterus, Inc.,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Angela M Mueller, Notary Public
State of Oregon

My commission expires on: July 18th, 2020

Commission No. 952510

OFFICIAL STAMP
ANGELA M MUELLER
NOTARY PUBLIC - OREGON
COMMISSION NO. 952501
MY COMMISSION EXPIRES JULY 18, 2020

(Page 9 of 9)

RECEIVED FOR RECORD
Tiverton,R.I.
NANCY L. MELLO TOWN CLERK
Jan 12,2017 12:24P

DOC: 00000127
Bk: 1616 Ps: 122

Copy

### Exhibit A

A certain tract or parcel of land with the buildings and improvements thereon, if any, situated on the southwesterly side of Riverview Avenue in the Town of Tiverton, County of Newport, State of Rhode Island, being further bounded and described as follows: Beginning at a point in the southwesterly line of Riverview Avenue at a drill hole, which is the northerly corner of the lot to be described; thence running Southwesterly 193 feet to a corner; thence running Southeasterly by other land now or formerly of these grantors and partly by Lot 21 on plan of land hereinafter described, 150 feet, more or less, to land of Elton H. Sanford; thence running Northeasterly by said last-named land, 130 feet to Riverview Avenue; thence running Northwesterly by Riverview Avenue, 127 feet to the point of beginning. Containing 16,064 square feet of land, more or less. Being designated as Lot 9 recorded in Plan Book 2, Page 27 of the Tiverton Land Evidence Records. Also being designated as Lot 9 on plan of land entitled, ?LAND OF JOHN M. TRAVERS RIVERVIEW & MT.HOPE AVENUE TIVERTON, RI.I. 1"=40? APR. 12, 1988 J. P. AMARANTES, RLS.? Recorded in Plan Book 18, Page 14. For source of title see Deed of John M. Travers and Dorothy V Travers dated March 20, 2007 and recorded in the Land Evidence Records of Tiverton in Book 1130, Page 277.
Also Known As: 51 RIVERVIEW AVE, TIVERTON, RI 02878-0000

EXHIBIT G

Return To:
CT LIEN SOLUTIONS
PO BOX 29071
GLENDALE, CA 91209-9071
Phone #: 800-331-3282

RECEIVED FOR RECORD
Tiverton,R.I.
NANCY L. MELLO TOWN CLERK
Jun 10,2013 10:22A

DOC: 00001456
Bk: 1456 Pg: 231

Prepared By:
CITIMORTGAGE, INC
KAITLIN HUTSON
1000 TECHNOLOGY DRIVE, MS 321

O'FALLON, MO 63368-2240

## ASSIGNMENT OF MORTGAGE

MERS SIS # 888-679-6377 MIN: 

Mortgage Electronic Registration Systems, Inc. as nominee for PRIMARY RESIDENTIAL MORTGAGE INC. Its successors and assigns, whose address is P.O. Box 2026, Flint, MI, 48501-2026, is a holder of that certain mortgage.

From: John J Travers AKA John Joseph Travers
To: Mortgage Electronic Registration Systems, Inc. as nominee for PRIMARY RESIDENTIAL MORTGAGE INC. Its successors and assigns
Property Address: 51 Riverview Ave, Tiverton, RI, 02878

dated 06/15/2007 recorded with the Records of Land Evidence in the Town or City of Tiverton Town at Book: 1147 Page: 103 Instrument No: 00002086

assigns said mortgage thereby to CitiMortgage, Inc., whose address is 1000 Technology Drive, O'Fallon, MO, 63368

IN WITNESS WHEREOF, the said Mortgage Electronic Registration Systems, Inc. as nominee for PRIMARY RESIDENTIAL MORTGAGE INC. Its successors and assigns  has caused these presents to be signed, in its name and behalf by Sandra West this _____ 5-29-13 _____.

Mortgage Electronic Registration Systems, Inc. as nominee for PRIMARY RESIDENTIAL MORTGAGE INC. its successors and assigns

By: _____
Sandra West
Assistant Secretary

STATE OF MISSOURI, ST. CHARLES COUNTY

On 5-29-13 _____ before me, the undersigned, a notary public in and for said state, personally appeared Sandra West, Assistant Secretary of Mortgage Electronic Registration Systems, Inc. as nominee for PRIMARY RESIDENTIAL MORTGAGE INC. Its successors and assigns personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

SYBIL SHORT
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Louis County
My Commission Expires: March 19, 2016
Commission Number: 12310870

Notary Public Sybil Short
Commission Expires: 03/19/2016

Page # 1 36310313 24449 RI579 Tiverton Town Internal

Return To:
CT LIEN SOLUTIONS
PO BOX 29071
GLENDALE , CA 91209-9071
Phone #: 800-331-3282

DOC# 00000605
Bk: 1491 Ps: 48

RECEIVED FOR RECORD
Tiverton,R.I.
NANCY L. MELLO TOWN CLERK
Mar 28,2014 12:42P

Prepared By:
CITIMORTGAGE, INC
AUDRA ENLOW
1000 TECHNOLOGY DRIVE, MS 321
O'FALLON , MO 63368-2240

## ASSIGNMENT OF MORTGAGE

 CitiMortgage, Inc. , whose address is 1000 Technology Drive, MS 321, O'Fallon, MO, 63368 , is a holder of that certain mortgage.

From: John J Travers AKA John Joseph Travers
To: Mortgage Electronic Registration Systems, Inc. as nominee for Primary Residential Mortgage Inc. its successors and assigns
Property Address: 51 Riverview Ave, Tiverton, RI, 02878

dated 06/15/2007 recorded with the Records of Land Evidence in the Town or City of Tiverton Town at Book: 1147 Page: 103 Instrument No: 00002086

assigns said mortgage thereby to Federal National Mortgage Association , whose address is c/o CitiMortgage, Inc., 1000 Technology Drive, O'Fallon, MO, 63368

IN WITNESS WHEREOF, the said CitiMortgage, Inc. has caused these presents to be signed, in its name and behalf by Audra K. Enlow this ____3 - 18- 14____ .

CitiMortgage, Inc.

By: _____
Audra K. Enlow
Document Control Officer

STATE OF MISSOURI, ST. CHARLES COUNTY

On __3 - 18 -14__ _____ before me, the undersigned, a notary public in and for said state, personally appeared Audra K. Enlow, Document Control Officer of CitiMortgage, Inc., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Laura M. Jones
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Charles County
My Commission Expires: March 19, 2016
Commission Number: 12316868

Notary Public Laura M. Jones

Commission Expires: 03/19/2016



DOC: 00002373
Bk: 1513 Pg: 185

RECEIVED FOR RECORD
Tiverton, R.I.
NANCY L. MELLO TOWN CLERK
Oct 20, 2014 12:54P

## ASSIGNMENT OF MORTGAGE

Contact Federal National Mortgage Association for this instrument c/o Seterus, Inc., 14523 SW Millikan Way, #200, Beaverton, OR 97005, telephone #1-866-570-5277, which is responsible for receiving payments. FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, CITIMORTGAGE, INC., WHOSE ADDRESS IS 1000 TECHNOLOGY DRIVE, O'FALLON, MO, 63368, (ASSIGNOR), by these presents does convey, grant, assign, transfer and set over the described Mortgage with all interest secured thereby, all liens, and any rights due or to become due thereon to FEDERAL NATIONAL MORTGAGE ASSOCIATION, WHOSE ADDRESS IS 14221 DALLAS PARKWAY SUITE 1000, DALLAS, TX 75254, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).

Said Mortgage is dated 06/15/2007, made by JOHN J TRAVERS to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC AS NOMINEE FOR PRIMARY RESIDENTIAL MORTGAGE INC., ITS SUCCESSORS AND ASSIGNS, and recorded in the Land Evidence Records in the Town of TIVERTON, State of Rhode Island, in Book 1147, Page 103 and Doc # 00002086.

Property is commonly known as: 51 RIVERVIEW AVE, TIVERTON, RI 02878.

IN WITNESS WHEREOF, CITIMORTGAGE, INC. has hereunto set its hand on ___10_/_10_/20_14_ (MM/DD/YYYY).

By: _____
Heather Navarro
VICE PRESIDENT

All persons whose signatures appear above have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

Signed and delivered in the presence of:

_____
Kimberly Samonte     Witness

STATE OF FLORIDA
COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me on __10_/_10_/20_14_ (MM/DD/YYYY), by Heather Navarro as VICE PRESIDENT of CITIMORTGAGE, INC., who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

_____
Danielle Kennedy
Notary Public - State of FLORIDA
Commission expires: 06/26/2017

DANIELLE KENNEDY
NOTARY PUBLIC
STATE OF FLORIDA
Comm# FF031267
Expires 6/26/2017

Document Prepared By: E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152

When Recorded Return To:
CitiMortgage, Inc.
C/O Nationwide Title Clearing, Inc. 2100 Alt. 19 North
Palm Harbor, FL 34683




RECEIVED FOR RECORD
Tiverton,R.I.
NANCY L. MELLO TOWN CLERK
Feb 28,2020 12:03P

DOC: 00000650
Bk: 1765 Pg: 163

FNMA Loan 

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, FEDERAL NATIONAL MORTGAGE ASSOCIATION, WHOSE ADDRESS IS 5600 GRANITE PKWY, BUILDING VII, PLANO, TX 75024, (ASSIGNOR), by these presents does convey, grant, assign, transfer and set over the described Mortgage with all interest secured thereby, all liens, and any rights due or to become due thereon to US BANK TRUST NATIONAL ASSOCIATION AS TRUSTEE FOR THE IGLOO SERIES IV TRUST, WHOSE ADDRESS IS 7114 E. STETSON DR., SUITE 250, SCOTTSDALE, AZ 85251, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).

Said Mortgage is dated 06/15/2007, made by JOHN J TRAVERS AKA. JOHN JOSEPH TRAVERS to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS MORTGAGEE, AS NOMINEE FOR PRIMARY RESIDENTIAL MORTGAGE INC., ITS SUCCESSORS AND ASSIGNS, and recorded in the Land Evidence Records in the Town of TIVERTON, State of Rhode Island, in Book 1147, Page 163 and Doc.# 00002086. Modification: 01/12/2017 BK: 1616 PG: 114 INSTR: 00000127

Property is commonly known as: 51 RIVERVIEW AVE, TIVERTON, RI 02878.

IN WITNESS WHEREOF, FEDERAL NATIONAL MORTGAGE ASSOCIATION, by NATIONWIDE TITLE CLEARING, INC., its Attorney-in-Fact has hereunto set its hand on ___2/2/___/2020 (MM/DD/YYYY).

By: _____
Shannon McKinney
VICE PRESIDENT

All persons whose signatures appear above have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

Signed and delivered in the presence of:

_____
Shauna Caine    Witness

STATE OF FLORIDA
COUNTY OF PINELLAS

The foregoing instrument was acknowledged before me by means of [X] physical presence or [ ] online notarization on ___2/21/___/2020 (MM/DD/YYYY), by Shannon McKinney as VICE PRESIDENT of NATIONWIDE TITLE CLEARING, INC. as Attorney-in-Fact for FEDERAL NATIONAL MORTGAGE ASSOCIATION, who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

_____
Melissa May
Notary Public - STATE OF FLORIDA
Commission expires: 10/27/2023

MELISSA MAY
NOTARY PUBLIC
STATE OF FLORIDA
COMM# GG 928423
EXPIRES: 10/27/2023

Document Prepared By: Dave LaRose/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152

When Recorded Return To:
Fannie Mae
C/O Nationwide Title Clearing, Inc. 2100 Alt. 19 North
Palm Harbor, FL 34683

FNMA 

DOC# 00001933
Bk# 1784 Pg# 251

Prepared By and Return To:

Collateral Department
Meridian Asset Services, LLC
3201 34th Street South, Suite 310
St. Petersburg, FL 33711
(727) 497-4650

Loan No: ████

Space above for Recorder's use

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, US BANK TRUST NATIONAL ASSOCIATION AS TRUSTEE OF THE IGLOO SERIES IV TRUST, whose address is 7114 E. STETSON DR., SUITE 250, SCOTTSDALE, ARIZONA 85251, (ASSIGNOR), does hereby grant, assign and transfer to US BANK TRUST N.A., AS TRUSTEE OF THE BUNGALOW SERIES IV TRUST, whose address is 7114 E. STETSON DR., SUITE 250, SCOTTSDALE, ARIZONA 85251, (ASSIGNEE), its successors, transferees and assigns forever, all beneficial interest under that certain mortgage, together with the certain note(s) described therein with all interest, all liens, and any rights due or to become due thereon.

Date of Mortgage: 6/15/2007
Original Loan Amount: $300,000.00
Executed by (Borrower(s)): JOHN J TRAVERS AKA JOHN JOSEPH TRAVERS
Original Lender: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS MORTGAGEE, AS NOMINEE FOR PRIMARY RESIDENTIAL MORTGAGE INC., ITS SUCCESSORS AND ASSIGNS
Filed of Record: In Mortgage Book/Liber/Volume 1147, Page 103
Document/Instrument No: 00002086 in the Recording District of Tiverton Township, RI, Recorded on 6/18/2007.

Property more commonly described as: 51 RIVERVIEW AVE, TIVERTON, RHODE ISLAND 02878 .

IN WITNESS WHEREOF, the undersigned by its duly elected officers and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this assignment.

Date:  6/4/2020

US BANK TRUST NATIONAL ASSOCIATION AS TRUSTEE OF THE IGLOO SERIES IV TRUST, BY MERIDIAN ASSET SERVICES, LLC, ITS ATTORNEY-IN-FACT

By: RICHARD NEFFE, JR.
Title: VICE PRESIDENT



Witness Name: BRIANNA DAVIAU

DOC# 00001933
Bk# 1784 Pg# 252

> A NOTARY PUBLIC OR OTHER OFFICER COMPLETING THIS CERTIFICATE VERIFIES ONLY THE IDENTITY OF THE INDIVIDUAL WHO SIGNED THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED, AND NOT THE TRUTHFULNESS, ACCURACY, OR VALIDITY OF THAT DOCUMENT

State of **FLORIDA**
County of **PINELLAS**

On 6/4/2020, before me, BRIAN FERRITO, a Notary Public, personally appeared RICHARD NEEFE, JR., VICE PRESIDENT of/for MERIDIAN ASSET SERVICES, LLC, AS ATTORNEY-IN-FACT FOR US BANK TRUST NATIONAL ASSOCIATION AS TRUSTEE OF THE IGLOO SERIES IV TRUST, personally known to me, or who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of FLORIDA that the foregoing paragraph is true and correct. I further certify the foregoing instrument was acknowledged before me by means of ☑ physical presence or ☐ online notarization and that RICHARD NEEFE, JR., signed, sealed, attested and delivered this document as a voluntary act in my presence.

Witness my hand and official seal.

(Notary Name): BRIAN FERRITO
My commission expires: 8/28/2023

Brian Ferrito
NOTARY PUBLIC
STATE OF FLORIDA
Comm# GG355953
Expires 8/28/2023

RECEIVED FOR RECORD
Tiverton,R.I.
NANCY L. MELLO TOWN CLERK
Jun 30,2020 11:00A

EXHIBIT H

Department of Defense Manpower Data Center

Results as of : Mar-13-2023 04:45:03 PM

SCRA 5.15



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

SSN:             XXX-XX█████
Birth Date:
Last Name:       TRAVERS
First Name:      JOHN
Middle Name:
Status As Of:    Mar-13-2023
Certificate ID:  89VX531CF46ZV8Y

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual' left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Michael V. Sorrento*

Michael V. Sorrento, Director
Department of Defense - Manpower Data Center
400 Gigling Rd.
Seaside, CA  93955

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. § 3901 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service. Service contact information can be found on the SCRA website's FAQ page (Q35) via this URL: https://scra.dmdc.osd.mil/scra/#/faqs. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. § 3921(c).

This response reflects the following information: (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d) (1). Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available. In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds. All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support. This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs). Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate. SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC § 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction. The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING: This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester. Providing erroneous information will cause an erroneous certificate to be provided.

Department of Defense Manpower Data Center

Results as of : Mar-13-2023 04:45:51 PM

SCRA 5.15



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

SSN:            XXX-XX-
Birth Date:
Last Name:      TRAVERS
First Name:     JOHN
Middle Name:
Status As Of:   Mar-13-2023
Certificate ID: W9859CL13MPMTTS

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Michael V. Sorrento*

Michael V. Sorrento, Director
Department of Defense - Manpower Data Center
400 Gigling Rd.
Seaside, CA 93955

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. § 3901 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service. Service contact information can be found on the SCRA website's FAQ page (Q35) via this URL: https://scra.dmdc.osd.mil/scra/#/faqs. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. § 3921(c).

This response reflects the following information:  (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days  preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d) (1).  Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available.  In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds.  All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support.  This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs).  Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate.  SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC § 101(c)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction.  The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING: This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester.  Providing erroneous information will cause an erroneous certificate to be provided.